IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>            Plaintiff,<br><br>vs.<br><br>SHAVARIM J. WICKS,<br>            Defendant. | MOTION TO SUPPRESS<br>EVIDENCE and REQUEST FOR<br>EVIDENTIARY HEARING<br><br>Case No. 25-CR-63-wmc-002 |

Shavarim J. Wicks, by attorney Robert T. Ruth and Robert T. Ruth Law Offices, S.C., moves this Court pursuant to Rule 12(b) and the 4th Amendment to the U.S. Constitution for an Order prohibiting the government from introducing at trial any evidence or information seized or derived from evidence seized pursuant to a May 29, 2024, search of the building at 1237 Rutledge Street, Madison, Wisconsin. As grounds, Wicks asserts that:

1. The applications lack probable cause, and they are so lacking in indicia of probable cause that no reasonable officer would rely on them.

2. The warrant is unconstitutionally overbroad, and its overbreadth should be obvious to any reasonable police officer.

3. The affiant in the warrant applications made deliberately or recklessly false material statements.

## STANDING

Wicks explains in an attached affidavit that he was an overnight guest in Jamar Purnell's upstairs apartment at 1237 Rutledge Street in May 2024. (*See* Ex. 6 and attachments). It is well-settled that overnight guests have a legitimate expectation of privacy in their host's home. *See Minnesota v. Olson*, 495 U.S. 91 (1990). That gives the overnight guest standing to challenge a search of the host's home. *Id*. at 96-97.

## FACTS AND BASIS FOR SUPPRESSION

Detective Samatha Kellogg applied three times for a warrant to search the building at 1237 Rutledge Street in Madison, Wisconsin. All three applications and warrants are attached. (*See* Exhibits 1, 2, and 3).

In the first application, Kellogg tells the story of a series of controlled buys between Jeffrey Thompson and an undercover officer that occurred from March 18 to May 14, 2024. The application contains probable cause to believe that on March 28, April 4, April 11, April 25, and May 2, Wicks delivered to Thompson the controlled substances that Thompson delivered to the undercover. The application also contains probable cause to believe that Wicks drove a blue Ford Escape with Wisconsin plate AVT 1716 to and from these deliveries.

The application explains that the Ford Escape is registered to Tokea S. Miller, who resides at 1115 E. Wilson Street. Officers, however, observed Wicks drive the Ford Escape and park it in front of 1237 Rutledge Street numerous

times during the relevant timeframe. Data from a GPS device placed on the vehicle showed that after May 2, 2024, it was routinely parked in front of 1237 Rutledge Street during the overnight hours. On April 25, 2024, after the Ford Escape left the area of a controlled buy, officers observed it stop at the Federal Courthouse for a few minutes, then drive to Festival Foods on East Washington Avenue. Officers observed a black male who they later learned was Wicks get out of the vehicle and return with groceries. After the trip to Festival Foods, officers watched Wicks drive the Ford Escape to 1237 Rutledge. After Wicks parked the vehicle in front of 1237 Rutledge, officers watched him bring the trash containers from the street back to the house and then enter the house with the groceries.

The first application asserts that Susan LaCava owns the house at 1237 Rutledge and that it is listed on the City of Madison assessor website as a single-family home with three bedrooms and 990 square feet of living on both the first and the second floors. Notwithstanding the information on the assessor website, Kellogg explains in the application that the building is divided into multiple units. Kellogg included information from a 2022 police report from Officer Ben Enstrom, who apparently visited the house and noted that LaCava occupied "most of the first floor and there were several locked doors upstairs for people who rented rooms."

Kellogg also included in the application that she personally observed Wicks use keys to enter the front door on "several occasions" in May 2024.

The court rejected the first application, apparently for a lack of information about which unit Wicks's allegedly resided in. The second application is the same as the first except that Kellogg added that Detective Dan Feeney contacted the owner, Susan LaCava, on May 29, 2024. The application explains that LaCava told Detective Feeney that she could not "positively ID any of her tenants upstairs." From here, without stating a basis for the assertions, the second application states as follows:

> LaCava occupies the first floor and rents the upstairs to a Jay Purnell and a friend of Purnell's whom she doesn't know. Another tenant, Gerald Harris said both Jay and Fresh are the tenants and are associated with the Ford Escape. Other information from Agent Kyle Dilley of DCI and DCI-CI-1 indicated that Wicks is known as Fresh and lives with someone named Jay and both are involved in drug sales. Harris pointed out both rooms that are associated with Jay and Harris as listed above.

(Ex. 2 at bates 74818).

There are multiple flaws in the above paragraph that are ultimately fatal to the application. First, the statement that LaCava rents the upstairs to Jay Purnell and a friend of Purnell's is wholly conclusory. *See Aguilar* v. *Texas*, 378 U.S. 108 (1964)(conclusory statements give the magistrate virtually no basis at all for making a judgment regarding probable cause). It is also worth noting that the conclusory assertion about who rents one of the upstairs rooms is flatly contradicted by the fact that LaCava told Detective Feeney that she could not "positively ID any of her tenants upstairs."

Second, the statements attributed to Gerald Harris are deeply flawed. Specifically, the application asserts that,

> Another tenant, Gerald Harris said both Jay and Fresh are the tenants and are associated with the Ford Escape.

Such an assertion is meaningless because there is no information in the application for why the court should believe that Gerald Harris is a tenant, when Harris allegedly made this statement, or who claims that Harris made the statement. More importantly, however, the statement attributed to Gerald Harris is materially false. The report of Detective Feeney shows that Harris never said that "Jay and Fresh are tenants." Harris actually said that he has seen Jay and Fresh "at the property" and that "Fresh is at the apartment frequently." (*See* Ex. 5 at bates 2699). The affiant clearly had access to Detective Feeney's report, so there is no legitimate excuse for getting this wrong other than that it was done deliberately or with reckless disregard for the truth. The statement is also material because once the conclusory assertion that "LaCava… rents the upstairs to a Jay Purnell and a friend of Purnell's" is removed because it is conclusory, it is the only statement that Wicks is an actual tenant at this property.

Third, the application fails to provide background information on the statements attributed to DCI-CI-1.

The application asserts that,

> Other information from Agent Kyle Dilley of DCI and DCI-Cl-I indicated that Wicks is known as Fresh and lives with someone named Jay and both are involved in drug sales.

There is no information in the application to indicate how DCI-CI-1 knows that "Wicks is known as Fresh and lives with someone named Jay and both are involved in drug sales." Also, the application does not say when DCI-CI-1 supposedly made this claim or when Wicks supposedly lived with Jay. Finally, the second application does not include any information about the veracity of the CI.

The court signed the warrant associated with the second application at 4:13 p.m. The warrant describes the "premises" to be searched as follows:

> 1237 Rutledge St is located in the city of Madison, Dane County, WI. 1237 Rutledge St is a 3-story single family residence. The exterior of 1237 Rutledge St consists of beige siding with red trim and there is a full front porch across the front of the house with stairs leading up to the porch on the left (north corner). The front door and main entrance to 1237 Rutledge St are on the left side of the porch as you approach the house. The front door is brown with 6 small windows at the top, one of the panes is covered with plywood. There is a black mailbox to the right of the door. Three-inch-high white numbers 1237 are located on a black mailbox to the right of the front door. This residence is occupied by the owner on the first floor with locked rooms on the second floor for other occupants. There is a common hallway on the first floor with stair leading to a common hallway on the second floor. At the top of the stairs are 2 rooms with deadbolts that are occupied by tenants that are associated with a blue Ford Escape WI plate AVT 1716 as pictured below.

(Ex. 2 at bates 74824). The warrant "commanded" officers to "forthwith" search "said premises."

The problem with commanding officers to search the entire premises is that "said premises" is a multi-unit dwelling and the application does not even pretend to justify a search of any unit except the unit associated with "Jay and Fresh." It is well-settled that a warrant is fatally overbroad when it authorizes the search of an entire multi-unit building where the officers do not have probable cause to believe either that there is illegal activity occurring in each separate unit of the building or that the entire building is under the "dominion and control" of the person targeted for the search. *See Jacobs v. City of Chicago*, 215 F.3d 758, 771 (7th Cir. 2000)(citations omitted). The fact that this warrant, which permitted a search of the entire building, is overbroad should have been obvious to the police. Detective Kellogg knew that this was a multi-unit building and she knew that the first warrant was rejected because the application failed to identify which room was occupied by Wicks. When the judge identified this flaw in the first application, she added language to the next application, but she never modified the warrant to limit the search area to the specific room or rooms allegedly occupied by the drug dealers. There is no excuse for this.

Officers commenced the search of the premises at 4:32 p.m. (Ex. 4 at bates 2707). In the search of the two upstairs rooms with deadbolts, officers found 26.4 pounds of methamphetamine, a firearm, currency and various other drugs and drug related items. (*id.* at bates 2706).

After the search started, Detective Kellogg submitted a third warrant application when she noticed that she neglected to include any information about the veracity of the confidential informant. The third application was the same as the second one, except that it included the following language:

> DCI-CI-1 has a criminal history record including arrests and or convictions for possession of schedule I and II narcotic drugs, manufacture deliver heroin, possess drug paraphernalia, and possess with intent heroin. DCI-CI-1 is providing cooperation for potential consideration for a pending methamphetamine and fentanyl trafficking investigation. Nonetheless, SA Dilley believes that the information DCI-CI-1 provided is reliable for several reasons. First, it is in DCI CI-1's self-interest to provide accurate information. Based on conversations law enforcement personnel had with DCI-CI-1, SA Dilley believed that he/she understands that it is a crime to provide false information to a law enforcement officer and that he/she will receive no benefit if his/her information proves to be incorrect or invalid. Second, some of the information DCI-CI-I provided was independently corroborated by information obtained by investigators before and during the investigation.

(Ex. 3 at bates 74784). The warrant associated with the third application was signed at 4:43 p.m. (*id.* at 74788).

Wicks contends that the second application is the application that matters, since the officers started the search at 4:32 p.m. based on that warrant. The officers did not note when they found each item, so there is no way to determine what was found after the final warrant was signed. (*See* Ex. 4, report detailing the search). Even if the court disagrees, however, the third application also lacks probable cause because it lacks information about the basis of knowledge for the same material allegations. The lack of probable cause in both applications is so obvious that a reasonably well-trained officer would have known that they failed to establish probable cause.

If the court disagrees with the above and finds that the application contains probable cause, or that the warrant is not overbroad, or that the good faith exception should apply, it remains that the allegation that Gerald Harris claimed that "Jay and Fresh are tenants" is false. When this false material fact is excluded, there is no claim in the application that Wicks lives in the upstairs apartment with Purnell. Absent proof that Wicks lived in the upstairs apartment with Purnell, there is no probable cause to search that unit and a reasonably well-informed officer should have known it. Wicks requests an evidentiary hearing to prove that this representation in the application attributed to Harris is false.

Dated this 26th day of February 2026.

Respectfully submitted,

_____/s/_____
Robert T. Ruth

## *CERTIFICATE OF SERVICE*

I served a copy of this document and attachments on the government via ECF.

Respectfully submitted,

_____/s/_____
Robert T. Ruth

Robert T. Ruth Law Offices, S.C.
7 N. Pinckney St., #240
Madison, WI  53703
(608)257-2540